IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

QAWEE ALI                                           *
        Plaintiff,
    v.                                              *   CIVIL ACTION NO. DKC-10-1676

CORRECTIONAL MEDICAL SERVICES,      *
 INC., et al.
        Defendants.                              *
                                                        ***

## MEMORANDUM OPINION

I.    PROCEDURAL HISTORY

For the second time in as many years, Qawee Ali ("Ali"), formerly Van Cleve Ashley, filed a civil rights complaint seeking damages for the alleged failure to provide him medical care for injuries sustained when he was attacked by another prisoner on January 13, 2007. Plaintiff also alleges Defendants Romano and Rosenstein failed to protect him from a known risk of harm. *See also Ali v. CMS, et al.,* Civil Action No. DKC-08-461 (D. Md.) At all relevant times, Ali was a federal pre-trial detainee held at the Maryland Correctional Adjustment Center ("MCAC") in Baltimore. In this action, received for filing on June 17, 2010, Ali raises a panoply of constitutional and pendent state tort and contract claims, regarding his safety and medical care during his MCAC detention.[1]

Ali focuses on two primary concerns. First, he discusses his January 13, 2007 attack and the injuries to his face (jaw and teeth). Ali alleges that the triage nurse initially failed to provide him care and he was not provided medical attention over the course of the following two weeks. He asserts that it was not until January 24, 2007, that he received CT scans and a panorex x-ray which revealed he had a displaced left mandibular angle fracture containing root tips of his lower left

---

[1]     To the extent Plaintiff raises state law claims, the court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. §1367(c)(3); *United Mine Workers v. Gibbs,* 383 U. S. 715, 726 (1966).

molar.  According to Ali, he was transported to the University of Maryland Medical Center ("UMMC") the following day and received extensive surgery.

Ali complains that he did not receive adequate post-surgical care when he was returned to a prison infirmary from UMMC.  He asserts that he developed mouth pain and swelling which medical staff incorrectly attributed to a heretofore undiagnosed condition of hypertension.  He further alleges that he was ordered removed from the infirmary and transferred back to MCAC.  After he was returned to MCAC he did not receive proper care resulting in the development of an infection causing the loss of a substantial amount of jaw bone and necessitating a second surgery to remove a portion of his mandible.

Ali further alleges that upon his return to the infirmary, after the second surgery, he again failed to receive adequate care.  Ali complains that Tedla improperly discharged him from the infirmary back to MCAC knowing that Ali would not have access to the necessary level of medical care at MCAC.  Ali alleges that despite his complaints, he was not treated properly and approximately one month after his second surgery it was discovered that his jaw was not healing properly.

Ali underwent a third operation on his jaw in November, 2007. Ali alleges that upon his subsequent return to the infirmary he again was denied proper care and his complaints were ignored. ECF Nos. 1, 32 & 35.

II.   PENDING MOTIONS

Currently pending before the court are the motion of (1) Defendants Correctional Medical Services, Inc., Fasil Wubu, M.D., Asresahegn Getachew, M.D., Getnet Luka, M.D., Philomina Olemgbe, R.N., and Tadessa Tedla, M.D. and (2) Defendants Christopher J. Romano and Rod J.

Rosenstein to Dismiss or, in the Alternative, Motion for Summary Judgment.[2] ECF Nos. 20 and 30. Plaintiff has filed Oppositions thereto. ECF Nos. 32 & 35. The undersigned has examined the medical records, additional exhibits, and declarations submitted by the parties and finds that no hearing is necessary. *See* Local Rule 105.6. (D. Md. 2011). For reasons to follow, Defendants' papers, construed as motions for summary judgment, shall be granted.

III.   STANDARD OF REVIEW

Under revised Fed. R. Civ. P. 56(a):

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

---

[2]   Defendant Administrator James has not been properly served with the Complaint. For the reasons that follow, even if this Defendant had been properly served, Plaintiff's claims against him would be subject to dismissal.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, the court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

IV. DISCUSSION

1. Facts

According to Government Defendants Romano and Rosenstein, Plaintiff was indicted on January 25, 2006, in the United States District Court for the District of Maryland. ECF No. 30, Ex. 1. He was ordered detained pending trial and by agreement with the U.S Marshal Service was

housed at the Maryland Correctional Adjustment Center ("MCAC").  *Id.*, Exs. 3-5.  Officials at MCAC were responsible for Plaintiff's safety and medical care while he was housed there. *Id*. Defendants maintain that Plaintiff has failed to exhaust his remedies under the Federal Tort Claims Act. *Id*., Ex. 6.

According to the Medical Defendants, Plaintiff was evaluated by Nurse Olemgbe on January 13, 2007.  Plaintiff advised Olemgbe that he was involved in a fight with another inmate.  He complained of mild pain and a burning sensation on his face.  Olemgbe washed the pepper spray from Plaintiff's face until he indicated he was comfortable.  She noted that Plaintiff had a superficial bruise on his shoulder.  No bleeding was observed at the site of the bruise and an ice pack was applied to the shoulder.  Plaintiff lost one of his molars.  Olemgbe observed a moderate amount of bleeding from the molar site.  The nurse palpated the molar site to ensure there were no broken parts of the tooth left inside of Plaintiff's mouth. She did not feel any parts of the lost molar.  Olemgbe notified Akin Ayemi, M.D. of her evaluation of Plaintiff and his condition.  Dr. Ayeni ordered Tylenol for Plaintiff's pain which Olemgbe administered.  Dr. Ayeni also referred Plaintiff to the dentist for evaluation and directed Plaintiff  report to the medical unit if his condition changed.  Olemgbe avers that she did not tell Plaintiff, as he claims, that she "did not have time for this shit;" to the contrary she recalls that he was the only patient she had to take care of that evening and was not too busy to provide the attention he required.  She avers that after her examination, Plaintiff stated that he wanted to return to his cell. ECF No. 20, Ex. A, B, p. 1-3, & C.

Plaintiff was evaluated, on January 17, 2007 at approximately 5:00 p.m., by Anthony Nwaiwu, R.N. , due to Plaintiff's complaints of severe pain, numbness of his left cheek, difficulty chewing and swallowing, and two missing teeth.  Nwaiwu noted Plaintiff's left jaw was tender to the

touch and his ability to open his mouth was limited. Cherrelle Reddick-Lane, M.D. was notified by Nwaiwu of Plaintiff's condition. She ordered an x-ray of Plaintiff's mandible, Motrin for pain relief, and a soft diet. *Id*., Ex. A & B, p. 4-5.

The following morning Nwaiwu notified the x-ray technician of the order for the x-ray and an appointment was scheduled for later the same day. The x-ray technician called and cancelled the appointment at approximately 11:00 a.m. Nwaiwu noted in the medical chart that he stressed to the technician the importance of the x-ray. An appointment was made for the x-ray to be taken on January 19, 2007, but again the technician cancelled the appointment. *Id*., p. 6-7.

The x-ray was completed on January 24, 2007 and showed a fracture of Plaintiff's mandible. On January 25, 2007, Plaintiff was transported to the Urgent Care Clinic at the University of Maryland Medical Center ("UMMC"). On January 28, 2007, Plaintiff underwent a transbuccal (through the mouth) open reduction/internal fixation of the left mandible fracture. He returned to MCAC on or about January 30, 2007. *Id*., p. 8-10.

Plaintiff was examined by Dr. Reddick-Lane on January 31, 2007. She noted that he was returned to MCAC from UMMC without orders. He had received Motrin for pain relief the preceding day. Plaintiff advised he tasted pus in his mouth and had a fever the night before. Dr. Reddick-Lane ordered Plaintiff transported back to the UMMC Emergency Department for evaluation by an oral surgeon. He was transported the same day. *Id*., p. 11-12.

On or about February 1, 2007, Plaintiff was discharged from UMMC to the third floor Infirmary at MTC. *Id*., Ex. A. On February 3, 2007, Dr. Wubu prescribed Plaintiff an antibiotic oral rinse (Peridex), acetaminophen with codeine (Tylenol #3) for pain relief, and Ensure, a nutritional supplement. Dr. Wubu also discharged Plaintiff from the Infirmary back to his unit at MCAC.

Plaintiff was scheduled for follow-up in the Chronic Care Clinic ("CCC") and advised to return to the clinic if he experienced fever, chills or discharge. *Id.* Exs. A & B, p. 13.

On February 5, 2007, Dr. Reddick-Lane renewed Plaintiff's order for Ensure. She examined Plaintiff on February 9, 2007. She noted that although Plaintiff reported he had mouth odor, physicians at UMMC found no infection in Plaintiff's mouth. She renewed Plaintiff's prescriptions for Ensure and Peridex and changed Plaintiff's pain medication to Motrin. She also ordered an oro-maxillofacial surgery ("OMFS") follow-up appointment. *Id.*, p. 14-17.

Plaintiff was again evaluated by Dr. Reddick-Lane on February 16, 2007. Dr. Reddick-Lane noted that Plaintiff had been seen by the OMFS on February 15, 2007. She further noted that the OMFS diagnosed a minor infection but further indicated Plaintiff's jaw was healing with the hardware in place. Plaintiff reported feeling well with some pain. Dr. Reddick-Lane prescribed an antibiotic--Clindamycin, for Plaintiff's infection and continued the oral rinse, nutritional supplement and analgesic for pain relief. *Id.*, p. 18-20.

On February 28, 2007, Plaintiff indicated he felt a "pop" and a sudden increase in swelling in his jaw. On March 2, 2007, Plaintiff was transported to UMMC for further evaluation by the OMFS staff. A panorex x-ray revealed a nonunion of the left angle of the mandible and destruction of the bone at the fracture line.[3] Plaintiff underwent additional surgery at UMMC, including a left partial madibulectomy (removal of the mandible), removal of previously inserted hardware in the deep bone, and placement of a reconstruction bar in the mandible. *Id.*, p. 21-22.

On March 4, 2007, Plaintiff was discharged from UMMC to the third floor Infirmary at MTC. For security reasons, Plaintiff was moved from the third floor Infirmary to the fourth floor

---

[3] A nonunion is a known complication of mandible fractures. ECF No. 20, Ex. A.

Infirmary on March 6, 2007.  On that date, Dr. Tedla noted Plaintiff had a nonunion of the left mandibular angle fracture following his surgery and insertion of a titanium plate.  He continued Plaintiff's pain medication and soft diet and ordered a follow-up visit for Plaintiff with the OMFS staff at UMMC.  During Plaintiff's stay in the fourth floor Infirmary at MTC, Dr. Tedla examined Plaintiff daily.  On March 8, 2007, Dr. Tedla noted there was minimal purulent drainage from the drain site in Plaintiff's jaw.  Plaintiff pain mediation, soft diet and wet-to dry dressings on the drain site were continued.  Dr. Tedla further noted that the OMFS follow-up appointment had been authorized.  *Id*., p. 23-25.

Plaintiff was again examined by Dr. Tedla on March 12, 2007.  Dr. Tedla noted that Plaintiff had been seen that day at UMMC for removal of the staple sutures and packing of his wound.  Dr. Tedla further noted that OMFS staff ordered the packing in Plaintiff's wound changed twice day.  Plaintiff's treatment plan was otherwise continued.  The following day, Dr. Tedla noted that Plaintiff was not experiencing any new symptoms but had refused to take the prescribed antibiotic because he claimed the medication upset his stomach.  Plaintiff's antibiotic was changed and Dr. Tedla continued monitoring Plaintiff daily while he was housed in the Infirmary.  Plaintiff was transferred back to MCAC on March 20, 2007. *Id*.,  Exs. A & B, p. 26-29.

On March 23, 2007, Dr. Reddick-Lane noted Plaintiff visited the medical unit and advised her that he was stable after his second surgery but needed oral rinse.  Dr. Reddick-Lane prescribed the oral rinse and noted that Plaintiff was scheduled to return to UMMC for follow up and would be seen weekly in the medical unit for routine assessment.  *Id*., p. 30.

Plaintiff was again seen by OMFS staff at UMMC on April 3, 2007.  The surgeon noted the purulent drainage was resolved and there were no other signs of infection.  Plaintiff reported to the

8

surgeon that he had been returned to general population and was therefore not receiving pain medication or being provided a soft diet. The surgeon recommended Plaintiff continue to be monitored in the Infirmary, continue on a liquid diet for two additional weeks and continue on pain medication as needed.  Upon his return from UMMC, Plaintiff was re-admitted to the fourth floor Infirmary for pain control as recommended by OMFS.  Dr. Tedla prescribed Tylenol #3 for Plaintiff's pain until Percocet, the narcotic analgesic recommended by the OMFS staff, could be obtained.  *Id*., p. 23, 31-34

On April 9, 2007,  orders were entered discharging Plaintiff from the Infirmary and authorizing his transfer back to MCAC.  A finding was made that there was no medical reason to keep Plaintiff  in the Infirmary as his medical condition could be managed on an out-patient basis with Plaintiff receiving Motrin and Nubain injections as necessary for pain relief. *Id*., p. 31, 35.  He was re-admitted to the Infirmary for further pain management on April 11, 2007.  *Id*., p. 36-39.

On May 2, 2007, Plaintiff reported to Dr. Tedla his belief that his jaw was mal-aligned.  Dr. Tedla ordered an x-ray of Plaintiff's jaw which was taken on May 3, 2007. The x-ray showed resorption (breakdown) of the bone and a three to four millimeter gap at the fracture site.  Dr. Tedla referred Plaintiff to UMMC for further evaluation based on the x-ray findings and Plaintiff's continued complaints of displacement of his jaw, difficulty swallowing and increased swelling. Plaintiff was evaluated at UMMC on May 9, 2007.  It was observed that Plaintiff had swelling consistent with postoperative scar formation. There was no sign of infection. His occlusion was stable with no sign of dehiscence or infection.  It was recommended that Plaintiff wait three to four months before final reconstruction of his mandible be undertaken.  Plaintiff was returned to the

9

Infirmary with instructions to maintain a soft diet and notations that he would require intermittent pain management with Tylenol #3 and Percocet until the surgery date. *Id*., p. 40-47

Plaintiff was discharged from the Infirmary to MCAC on May 10, 2007 with Motrin as pain management. *Id*., p. 48-49. On May 16, 2007, Dr. Reddick Lane noted Plaintiff had an order to be admitted to the Infirmary on May 14, 2007; however as of that date he was still at MCAC and had not been transferred. She noted she spoke with the medical director who agreed to transfer Plaintiff to the infirmary. She noted Plaintiff's pain management included Nubain but Nubain gave Plaintiff a migraine headache and he therefore declined to take it. An order for Ultram was written; however, the recommendation from UMMC was for Tylenol #3 or Percocet until surgery. *Id*., p. 50. On an unknown date Plaintiff was returned to the Infirmary. Plaintiff remained in the Infirmary until June 8, 2007, when he was discharged back to MCAC with a prescription for Naprosyn for pain relief. *Id*., p. 51. Plaintiff was examined by Dr. Reddick-Lane on July 6, 2007 and August 31, 2007. He appeared in no acute distress. His soft diet was continued. On August 31, 2007, Reddick-Late noted that she spoke with Dr. Colletti the OMFS who confirmed it was time to schedule the final reconstruction surgery for Plaintiff. *Id*., p. 53-54.

OMFS staff at UMMC scheduled Plaintiff's reconstructive surgery for September 28, 2007, but the surgery was canceled by OMFS staff and rescheduled for November 9, 2007. *Id*., p. 55-56. On November 1, 2007, Plaintiff reported an increase in pain and a feeling that the hardware in his jaw was displaced. He was transported to the UMMC Emergency Department. A CT scan was performed which revealed no acute problem. *Id*., p 57.

On November 9, 2007, Plaintiff underwent a bone graft from his right hip to his left jaw. Upon his discharge from UMMC, he was re-admitted to the Infirmary for wound care and pain

10

control. On November 12 and 13, 2007, it was noted in Plaintiff's chart that he was angry, refused oral antibiotics, demanded intravenous antibiotics, threatened to sue the medical staff and refused to stay in the Infirmary. Dr. Wubu, notified of Plaintiff's conduct, came to the Infirmary to examine Plaintiff and discuss Plaintiff's care. After his examination and discussion with Dr. Wubu, Plaintiff was more cooperative and agreed to stay in the Infirmary. Plaintiff continued to be monitored in the Infirmary and his condition improved. *Id*., p. 59-68.

On November 23, 2007, Plaintiff was transported to UMMC for drainage of a seroma[4] of the mandible. Plaintiff reported to Dr. Wubu, on November 26, 2007, that he was "very happy" and not in pain. Dr. Wubu noted Plaintiff had no fever or drainage from the left side of his neck and appeared relaxed. Dr. Teferi noted on January 5 and 31, 2008, Plaintiff complained of pain in the hip and underwent a dental filling, respectively, but otherwise offered no new complaints. Plaintiff's care was continued.   He remained under observation in the Infirmary until he was transferred to an out of state prison on February 28, 2008. *Id*., p. 68-74.

2.	Legal Analysis

   A. Federal Tort Claim Act

Plaintiff's claims of negligence arising from the assault upon him and alleged lack of medical care against Defendants Rosenstein and Romano are subject to the Federal Tort Claims Act (FTCA) because they are, without doubt, federal employees. The FTCA provides a limited waiver of the sovereign immunity of the United States with respect to certain types of tort actions. Under the FTCA, the United States is liable, as a private person, for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the

---

[4]   A seroma is a build-up of clear bodily fluids where tissue has been removed by surgery.

Government while acting under the scope of his office or employment." 28 U.S.C. § 1346(b). As a waiver of sovereign immunity, the FTCA is to be narrowly construed and is not to be extended by implication. *See United States v. Nordic Village, Inc*., 503 U.S. 30, 34 (1992). Because the sovereign's consent to waiver of its immunity is to be narrowly construed, actions brought under the FTCA must be filed in exact compliance with its terms. To proceed under the FTCA, a claimant cannot file a lawsuit unless he has first presented an administrative claim to the appropriate federal agency and it has been finally denied or the agency has not made a final determination after the passage of six months. *See* 28 U.S.C. § 2675(a). Compliance with the administrative claim process is a jurisdictional prerequisite to suit under the FTCA. *See Kokotis v. United States Postal Service*, 223 F. 3d 275, 278 (4th Cir. 2000). Plaintiff has failed to file an administrative claim.

Plaintiff asks that his failure to comply with the requirements of the FTCA be waived. ECF No. 35. "Equitable tolling is not appropriate where … 'the claimant failed to exercise due diligence in preserving his legal rights.'" *Kokotis*, 223 F. 3d at 280 *citing Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, (1990). "Because of the importance of respecting limitations periods, equitable tolling is appropriate only 'where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.' Indeed, the doctrine of equitable tolling is based on the view that a defendant should not be encouraged to engage in 'misconduct that prevents the plaintiff from filing his or her claim on time.'"*Kokotis* 223 F. 3d at 281 (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir.1987)). Here, Plaintiff puts forth his counsel's dereliction as well as his transfer to a prison in New Jersey, and his "special needs." Deficient performance by one's own counsel is generally not enough to justify equitable tolling, *Rouse v. Lee*, 339 F.3d 238, 248 (4th Cir. 2003), nor is the mental incompetence of the type alleged here sufficient,

12

*McLewin By and Through Harrell v. U.S.*, 7 F.3d 224 n. 4 (4th Circ. 1993). Finally, Plaintiff's out-of-state transfer was not orchestrated by Defendants, nor would it prevent the filing of a timely claim. Plaintiff has not complied with the requirements of the FTCA, nor has he offered sufficient reasons to waive doing so. As a consequence, his claim against the Government Defendants is subject to dismissal.

Further, Plaintiff's claims are barred under the FTCA as the FTCA retains immunity for the United States for injuries caused by the acts or omissions of independent contractors performing work for the government. *See* 28 U.S.C. §2671; *see also Robb v United States,* 80 F. 3d 884, 887 (4th Cir. 1996). Plaintiff's claims regarding deficiencies in his safety and medical care while housed at MCAC were matters within the control of MCAC/Maryland Department of Public Safety and Correctional Services, an independent contractor. ECF No. 30, Exs. 4 & 5.

B.     Medical Claims

In order to state a claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).[5] Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with

---

[5] As a pretrial detainee, Plaintiff's right to adequate medical care is evaluated under the Due Process Clause of the Fourteenth Amendment. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). Notwithstanding this standard of review, the Fourth Circuit has held that the deliberate indifference standard set forth in *Estelle v. Gamble* is applicable to pretrial detainees. *See Loe v.Armistead*, 582 F. 2d 1291 (4th Cir. 1978); *Whisenant*, 739 F.2d at 164.

unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2001) *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

As a fundamental element of § 1983 liability, Plaintiff must show that the named Defendants were involved in the alleged deprivation of his constitutional rights. It is well established that the

doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001), *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

Plaintiff has pointed to no action or inaction on the part of Defendants Correctional Medical Services, Inc., Dr. Asresahegn Getachew, Dr. Getnet Luka, Administrator James, Rod J. Rosenstein, and Christopher J. Romano that resulted in a constitutional injury. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1997) (doctrine of *respondeat superior* does not apply to 42 U.S.C. § 1983 actions). It remains uncontroverted that these entities and individuals had no direct involvement in Plaintiff's medical treatment or any aspect of his health care.

The Complaint against the remaining Defendants is likewise subject to the entry of summary judgment dismissal.[6] The record shows that Plaintiff has received evaluation and treatment for his broken jaw including but not limited to diagnostic testing, pain medication, antibiotics, change in diet, and multiple surgeries. Despite Plaintiff's bald assertion, there is nothing in the record to suggest that the two week delay between the onset of his injury and his first surgery in any way contributed to the problems Plaintiff suffered which necessitated the additional surgeries. Rather, medical records reflect that when Plaintiff was evaluated at UMMC after the first surgery, the OMFS physician diagnosed a minor infection but determined Plaintiff's jaw was healing properly. Further, Getnet Luka, M.D., Regional Medical Director for CMS, avers that nonunion of the mandible is a known complication of a mandible fracture. This complication necessitated the second surgery. ECF No. 20, Ex. A. Plaintiff's third surgery, the bone graft, was necessitated by the resorption of Plaintiff's jaw bone. The delay in having the third surgery was principally due to the recommendation of UMMC staff that Plaintiff wait 3-4 months between surgeries before undertaking the graft and then occasioned by UMMC having to reschedule the surgery. *Id*.

It is undisputed that Plaintiff was discharged three times from the Infirmary to MCAC, contrary to the recommendations of the UMMC physicians. To the extent off-site medical providers recommended therapies that were ultimately disapproved by Plaintiff's on-site medical providers, such disagreement between medical professionals does not rise to the level of deliberate indifference. *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir.1977). There is simply nothing in the record to

---

[6] Because Plaintiff has complained rather continuously, to the medical providers, regarding his medical care since the assault in 2007, it is unclear whether the statute of limitations would bar Plaintiff's claims regarding his medical care occurring prior to June 22, 2007 (three years prior to the filing of this case). Because Plaintiff has failed to prove his claim, however, the limitations issue need not be resolved here.

support Plaintiff's contention that such transfers were retaliatory or evidenced a deliberate indifference to Plaintiff's medical needs. To the contrary, medical records demonstrate that the discharging physicians believed Plaintiff's pain could be managed through alternative medications at MCAC. When this proved to be untrue he was promptly returned to the Infirmary. *Id.*, Ex. A & B. The court does not dispute that Plaintiff was in pain when his medication was changed and in pain after he demonstrated intolerances to the alternative pain medication prescribed, but the court cannot find on the record before it that Drs. Tedla or Wubu subjectively knew that Plaintiff's pain could not be managed under the protocols they established. Accordingly, the court does not find that they were deliberately indifferent to his medical needs.

To the extent Plaintiff disagrees with Nurse Olemgbe's assessment of him after the assault, Plaintiff's claim also fails. The uncontroverted records reveal that Olemgbe thoroughly assessed Plaintiff's injuries, consulted with a physician regarding same, and provided medicine and referrals prescribed by the physician. *Id.*, Ex. A, B, & C. Disagreements with the course of treatment does not constitute an Eighth Amendment deprivation and would set out, at best, a claim of medical negligence which is not actionable under 42 U.S.C. § 1983.

V. CONCLUSION

For the aforementioned reasons, Defendants' Motions, construed as motions for summary judgment, shall be granted. A separate Order follows.

Date: __September 14, 2011__          /s/
                                                       DEBORAH K. CHASANOW
                                                       United States District Judge